UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------- X

AMSLER ADVISORS LLC                          :

            Plaintiff,                    :    Civil Action No.:  25-cv-10778-VEC

     -against-                             :    **STIPULATED ORDER REGARDING**
                                                  **DISCOVERY OF ELECTRONICALLY**
GVA PROPERTY MANAGEMENT and              :    **STORED INFORMATION**
ALBERT REUBEN CAPITAL,

           Defendants.                   :

--------------------------------------- X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/24/2026
```

## STIPULATED ORDER REGARDING DISCOVERY OF ELECTRONICALLY STORED INFORMATION

IT IS HEREBY STIPULATED AND AGREED by the Plaintiff Amsler Advisors LLC and Defendants GVA Property Management and Albert Reuben Capital ("Parties"), through their respective counsel, subject to the approval of the Court, that the following Stipulated Order Regarding the Discovery of Electronically Stored Information (the "Stipulated ESI Protocol" or the "Protocol") be entered by this Court:

## STIPULATED ESI PROTOCOL

**I.**    **Cooperation and Proportionality**

A. The Parties will conduct discovery in a cooperative manner. The Parties will meet and confer about issues or disputes related to electronic discovery, in an effort to avoid or resolve disputes without court intervention.

B. The Parties will consider the proportionality standard set forth in Fed. R. Civ. P. 26(b)(2)(C) in formulating their discovery plan. To further the application of the proportionality standard in discovery, requests for production of ESI and related responses should be reasonably targeted, clear, and as specific as practicable.

C. The Parties will consider the option of prioritizing certain discovery where appropriate. The Parties agree to a non-waiver inadvertent disclosure agreement pursuant to Federal Rule of Evidence Rule 502(d).

20337400

## II.    General Terms

A.  "Native format" means and refers to the format of ESI in which it was originally created or normally kept by the party making the production (the "Producing Party") in the usual course of its business and in its regularly conducted activities.

B.  "Metadata" means and refers to information about information or data about data, and includes without limitation:

1.  information embedded in or associated with a native file that is not ordinarily viewable or printable from the application that generated, edited, or modified such native file which describes the characteristics, origins, usage, and/or validity of the electronic file; and/or

2.  information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system.

C.  "Static Image" means or refers either 1) to a representation of ESI produced by converting a native file, or 2) to an image created by scanning a hard-copy document, into a standard image format capable of being viewed and printed on standard computer systems.

D.  "Parent" and "Child" documents are documents that contain logical companion documents or sub-documents. The common example is an email with attachments. The email is the parent and the attachments are the child documents.

E.  "Checksum Hash" or "Checksum" is a mathematical system that evaluates the contents of any electronic file and can produce a hash value. That hash value is used to represent and verify that the contents are what they were intended to be. It can also be used for deduplication. In terms of text documents, if even one character is changed, the entire hash is different. This is also known as an "exact duplicate."

F.  "RFC" or "Request for Comment" is the standards upon which the internet communication standards are specified.

## III.    Preservation

A.  The parties shall take reasonable and good faith steps to preserve documents within their possession, custody, or control that they know, or reasonably should know, are relevant to the claims and defenses at issue in this action, and shall continue to preserve such information during the pendency of this action.

B.  The Parties further acknowledge a litigation hold is in place and both Parties are taking reasonable and proportional steps to preserve potentially relevant information. A party may use any reasonable steps to preserve documents consistent with the party's record management systems, routine computer operation, ordinary business practices, and the preservation requirements of this Order. As used in this Order, "reasonable steps" include:

2

20337400

1. identifying individuals reasonably likely to possess or control potentially relevant documents;

2. notifying such individuals of their duties to preserve potentially relevant documents under the terms of this Order; and

3. monitoring compliance with the preservation requirements of this Order. For purposes of preservation, this Order does not obligate any party to segregate or collect potentially relevant documents unless the party has a reason to anticipate that, absent such actions, relevant information is likely to be lost during the pendency of this action.

C. The parties are required to act in good faith and shall not transfer ESI to another form solely for the purpose of increasing the burden of discovery for other parties.

D. The parties agree to take reasonable steps to preserve and collect records in a form that will permit the production of Metadata that is necessary to fulfill their agreement on the form of production, referenced in Exhibit A.

E. Additionally, the Parties agree that the following ESI does not have to be preserved or collected because it may not be reasonably accessible:

1. Back-up data that are substantially duplicative of data that are more accessible elsewhere; Data maintained or duplicated in any electronic backup system for the purpose of system recovery or information restoration, including but not limited to, system recovery backup tapes or other media, continuity of operations systems, and data or system mirrors or shadows, if such data are routinely purged, overwritten or otherwise made not reasonably accessible in accordance with an established routine system maintenance policy;

2. unallocated, slack space, deleted data, file fragments, or other data accessible by use of computer forensics;

3. random access memory (RAM), temporary files, or other ephemeral data (except data captured by ephemeral message platforms/apps) that are difficult to preserve without disabling the operating system;

4. on-line access data, such as temporary internet files, history, cache, cookies, and the like;

5. Data relating to online access, such as temporary Internet files, browser history, file or memory caches and cookies;

6. Data in metadata fields that are frequently updated automatically as part of the usual operation of a software application, operating system or network (e.g., data last opened) provided;

7. telephone or VOIP voice messages that are not regularly stored or saved in the course of business, unless any such messages were otherwise stored or saved;

3

20337400

8. operating system files, executable files, and log files (including web server, web services, system, network, application log files and associated databases, analysis output caches, and archives of such data);

9. data from a smartphone device where the Producing Party **knows, based on its standard practices,** that the information contained **is duplicative of other sources, and that those other sources *will* be searched in connection with discovery** (e.g., other email systems or cloud drives); and

10. any other file types subsequently agreed to by the parties.

F. Absent a showing of good cause, no party need restore any form of media upon which backup data is maintained in a party's normal or allowed processes, including but not limited to backup tapes, disks, SANS, and other forms of media, to comply with its discovery obligations in the present case. For the avoidance of doubt, CDs, DVDs, drives or other media that are used in the ordinary course of business to store original data shall be searched for responsive material.

## IV. Sources of ESI

A. The Parties agree to exchange a list of custodians likely to have discoverable information, including job title (or former job title), a brief description of custodian's responsibilities, and the employment period for each custodian. The Parties will meet and confer in good faith to reach an agreement regarding the custodians from whom relevant ESI will be collected and searched, and maintain the right to relevant ESI from custodians who may not originally have been identified as discovery progresses. Parties will seek to identify and produce all relevant documents from all sources and locations.

B. The time period for ESI searches shall be limited to the time period of June 30, 2020 through the present.

C. To achieve proportional and cost-effective discovery, the parties may agree to limitations on the scope of the search (*e.g.*, time frames, document types, keywords) to reasonably cull out non-responsive information. The parties may also agree to the use of predictive coding technology to identify documents responsive and unresponsive to Fed. R. Civ. P. 34 requests. The Parties further agree to be bound by the Stipulated Protective Order during the sharing of ESI. Nothing in this Stipulated ESI Protocol precludes any party from challenging the admissibility, discoverability, production, relevance, or confidentiality of information produced under this protocol or otherwise objecting to its production or use at trial.

D. Neither Party may seek relief from the Court concerning compliance with this Protocol unless it has conferred with other affected Parties. If necessary, this Protocol may be amended by written agreement of all Parties.

20337400

**V.    Search and Review**

A. **Collection.** Each Party will be responsible for reviewing and producing its own documents. The parties acknowledge that consistent with the Sedona Conference Principles, the producing party is in the best position to determine how best to preserve, search and produce its own potentially responsive documents. However, to facilitate a cooperative, efficient, and cost-effective discovery process, the Parties agree to meet and confer about ESI search terms and techniques to demonstrate an agreeable and efficient process.

1. The Parties shall exchange proposed ESI search terms. The Parties shall then meet and confer to attempt to reach an agreement on the search terms or other techniques to be used to identify potentially responsive documents.

2. To advance the meet and confer, the Parties shall discuss, to the extent not protected by the attorney-client privilege or work product doctrine, whether the search terms should include additional relevant email addresses, acronyms, slang, euphemisms, code words, nicknames, project names, terms of art, industry references, or other language likely to identify responsive documents, including appropriate synonyms for the proposed search terms and variations of search syntaxes. The Parties agree that search term negotiations and discussions of other limiters should be done in good faith and be cooperative in nature. The search term negotiations and identification of further search terms shall be an iterative process meant to identify all potentially responsive documents.

B. **Format**. Except for where indicated in the following paragraphs or specifically requested items by counsel, the default format for production of ESI shall be single-page TIFF+ files with extracted text, if available, and metadata in a load file as agreed by the parties in compliance with Exhibit A of this Order.

1. Each document will have text extracted for searching.

2. Metadata will be extracted formatted into fields specified by Exhibit A and following industry technical standards specified.

   a. Email addresses will follow either the name@somewhere.com or name@somewhere.com<Doe, John> pattern. (Reference See RFC 5322 @ 3.4)

   b. Email dates can follow either their native date format (Reference RFC 5322 @ 3.3) or standard ISO 8601 formatting that includes the time zone

   c. Document dates should follow standard ISO 8601 formatting that includes the time zone

3. Documents will be virtually "printed out" and Bates Stamped except in cases where the file does not lend itself to be printed; files should be produced as Native with a single page Bates Stamped as a representative of the document. A few examples are: spreadsheets, CADs, databases, movies, or audio recordings.

5

20337400

4. Every page will contain a case-wide and unique Bates Stamp. The Bates Stamp system will conform to the following:

   a. Bates Stamps shall **only** contain upper and lower case letters, numbers, dashes, and underscores.

   b. For each given Bates Stamp prefix, the numeric padding shall remain the same length.

5. For databases, to the extent a database contains responsive and non-responsive information, only potentially responsive information needs to be disclosed. To determine the data that is relevant to the document requests, a list of databases and systems used to manage relevant data should be provided with the following information:

   a. Database Location;

   b. Database Name;

   c. Database Type;

   d. Software Platform and Version:

   e. Business Unit;

   f. Searching Capabilities;

   g. Reporting Capabilities; and

   h. Database Administrator.

6. For proprietary items such as security footage and CADs discussion will be required to find a common format that will work for the receiving parties as well as not burdensome for the producing party.

7. Content such as text messages or messages from similar applications, such as but not limited to Instant Messenger, Slack, or Google Hangouts, each chain of messages shall be produced in spreadsheet format with attachments listed by file name and Bates number, and attachments included as children in the family.

8. Content contained in mobile phone messaging apps, such as iMessage, WeChat, WhatsApp, Signal, SMS, RCS, or similar applications, shall be produced according to each application's export function, if available. If the application lacks an export function, the parties shall first confer in good faith regarding how to produce the data, including whether taking screenshots is sufficient based on the scope of the information. If no agreement can be reached, the Producing Party shall, at its own expense, use a third-party forensic collection tool.

20337400

9.  In cases where only a paper version is available or a version of an electronic document that was printed out has hand-written notes, it will be scanned and the text will be generated using commercially available OCR technology, with each page Bates Stamped appropriately. Appropriate custodial, date, and location data will need to be supplied within the Metadata. (*See* Exhibit A).

10. In cases of redaction, then the document can either have the Native edited if it does not lend itself to "printing" or exported to Page Images with the redaction applied and text can either be adjusted or the Page Images can be OCR'd. (Printing out any electronic documents that require redaction and redacting on paper and then scanning back in is not acceptable.) Metadata must be copied over. Finally, a **redaction log** must be supplied, providing the Bates Stamp of the document and a brief justification for the redaction.

C.  **Native Files**. Native file documents, emails or attachments may be included with the electronic production using the below criteria:

1.  Excel spreadsheets should be produced in native format (with cells visible).

2.  Producing Party.

    a.  Documents produced in native format shall be re-named to reflect the production number.

    b.  The full path of the native file must be provided in the .DAT file for the NATIVE FILE field.

    c.  The confidentiality designation under the Stipulated Protective Order to be entered in this action will be produced in the load file in the CONFIDENTIALITY field.

3.  If documents produced in native format are printed for use in a deposition, motion or hearing, the party printing the document must print the slip sheet representing the document (which should contain the Bates Stamp and any confidentiality markings) and place as first page to the printed document.

D.  **Hierarchy**. Hierarchal structure of documents will be supplied (i.e. Parent/Child relationships). This is the scenario where there is a document that contains sub-documents, embedded objects, or links to cloud sources, such as Dropbox, OneDrive, SharePoint, or I-Manage Share.

1.  Sometimes child documents are overlooked. If this happens following the production of the files containing embedded objects, sub-documents or links to private documents via URL, a receiving party may make reasonable requests, with respect to specific embedded objects particularly identified in the requests, for production of these embedded objects as stand-alone files. The producing party shall cooperate reasonably in responding to any such requests and produce the embedded objects as stand-alone files.

20337400

2. Common situations where there are parent/child relationships include but are not limited to:

    a. Emails with embedded objects and attachments. If the embedded objects are not displayed upon the Static Image, then the object needs to be produced as a child document to the email. Attachments must be produced as a child document as well.

    b. Links to cloud sources, such as Dropbox, OneDrive, SharePoint, or I-Manage Share. In these situations, the parties should reproduce the documents linked in the folder to replicate how they would be produced if attached to the email or chat. If the link has been deactivated or deleted prior to the party's obligation to preserve ESI, then the Producing Party shall obtain and produce the information from other sources. If the information cannot be obtained, the Producing Party will produce a log of the documents that were once contained in the linked folder based on their knowledge and a reasonable investigation into the folder's contents.

    c. Compressed archives such as Zip, RAR, TAR, etc. shall have the archive as the parent and the contents as the child.

    d. The parties may exclude non-responsive embedded objects found in emails and PowerPoint files from the production, such as, if not relevant, company logos in email signatures. Embedded objects found in word processing and spreadsheet files are to be extracted and produced. However, if any embedded object is excluded from production, Parties must provide a brief justification for the exclusion.

    e. Following production of the files containing embedded objects, a receiving party may make reasonable requests, with respect to specific embedded objects particularly identified in the requests, for production of these embedded objects as stand-alone files. The producing party shall cooperate reasonably in responding to any such requests.

E. **Production File Structure**. The file structure of each of the productions shall have a root folder containing the production. That folder shall be named the production identifier. Within it will be contained:

1. the Load File (DAT file extension) will have its filename that of the production and will be located in the root of the production's directory. This is essentially a spreadsheet that has columns defined by Exhibit A and its contents delimited by the specifications in Exhibit C. This will also contain the extracted Metadata defined;

2. the file that links the page images to the documents within the Load File, also known as the OPTICON file (OPT file extension), will have its filename that of the production and will be located in the root of the production's directory. The structure of this file is defined in Exhibit B;

3. the Static Images will be contained in folder entitled "IMAGES" located in the root of the production's directory. This will contain sub-folders with the Static Images stored

8

within it. Each sub-folder cannot exceed 5,000 TIF/JPEG images (example: \ProductionFolder\IMAGES\01\ABC0001.JPG);

4. the extracted searchable text will be located in a folder entitled "TEXT" located in the root of the production's directory. This will contain sub-folders with the TXT files stored within it. Each sub-folder cannot exceed 5,000 files (example: \ProductionFolder\TEXT\01\ABC0001.txt); and

5. the native documents will be located in a folder entitled "NATIVES" located in the root of the production's directory. This will contain sub-folders with the native files stored within it. Each sub-folder cannot exceed 5,000 files (example: \ProductionFolder\NATIVES\01\ABC0001.xlsx).

6. It being understood that different ESI systems can typically generate and ingest different formats, if the foregoing does not work for a Parties' chosen ESI system, the parties shall meet and confer in good faith on alternative production and load finle specifications prior to production.

F. **Static Images**. Static Images are fair and accurate representations of each page of a document, virtually "printed out". The requirements are as follows:

1. They must have a minimum resolution of 300 dpi (dots per inch);

2. these Static Images can be saved as either a JPEG image file when color is involved or a TIFF Group IV black & white image file for non-color content; and

3. each Static Image file will be named with the case-wide unique Bates Stamped page they represent. The Bates Stamp will be located on the bottom right-hand corner of the page and any confidentiality markings will be on the bottom left-hand corner.

G. **Text**. Extracted text will be "exported" directly from the document. In cases of being a scanned or a redacted document, then OCR text can be substituted. In either case of extraction or OCR, correct text encoding must be observed, especially in cases such as Asian languages and Emoji's. If text is found to be "garbled" in either the Static Images or the extracted text, then a request for the native version may be required or reproduction of affected Static Images and/or extracted text. Additionally, all embedded web links (URLs) not visible in the Static Image will be supplied in the searchable text.

H. **Checksum Hash**. Parties must agree on a single checksum hash pattern to use for all documents within all subsequent productions. The choices are MD5, SHA1, or SHA256. This will be used for purposes of deduplication, uniqueness and verification across all productions from all parties. The chosen checksum hash will be a representation of the entire document's contents.

I. **De-duplication**. De-duplication will be based on the chosen Checksum Hash pattern, and each Party will disclose the methodology it used, if any, to de-duplicate. However:

20337400

1. de-duplication shall be performed only at the Parent Document level so that attachments are not de-duplicated against identical stand-alone versions of such Documents and vice versa;

2. attachments to emails or other Documents shall not be disassociated from the parent email or Document, even if they are exact duplicates of another Document in the production; and

3. hard copy Documents may not be eliminated as duplicates of responsive ESI if there is anything written on the hard copy Document that makes it different from the electronic copy. A Party may only de-duplicate "exact duplicate" Documents and may not de-duplicate "near-duplicate" Documents, both of the quoted terms in this sentence being given their ordinary meaning in the eDiscovery field.

4. The remaining version of the document after de-duplication will contain a listing of all custodians and file paths from all of the duplicates removed. This could be on a rolling nature if productions are on a rolling protocol.

J. **Exception Files**. Files that cannot be produced or imaged due to technical difficulties shall be identified as exception files. Common exception files include, without limitation, corruption, password protection, digital rights management, or proprietary software associated to the file. The parties will address on a case-by-case basis any exception files that appear to be significant to this litigation.

## VI.    Email Threads

A. Email threads are email communications that contain prior or lesser-inclusive email communications that also may exist separately in the party's electronic files. A most inclusive email thread is one that contains all of the prior or lesser-inclusive emails, including attachments, for that branch of the email thread.

B. A Producing Party may use e-mail thread suppression to exclude email from production, provided however, that an email that includes an attachment or content in the BCC or other blind copy field shall not be treated as a lesser-included version of an email that does not include the attachment or content, even if all remaining content in the email is identical. To the extent that a Producing Party uses e-mail thread suppression to exclude email from production, the Producing Party shall produce the metadata for that suppressed email.

C. Following production of the most-inclusive email threads, a receiving party may make reasonable requests, with respect to most-inclusive email threads particularly identified in the requests, for production of individual lesser-inclusive emails. The producing party shall cooperate reasonably in responding to any such requests.

## VII.    Standard for Addressing Privilege

A. With respect to privileged or attorney work product information generated after the filing of the complaint, parties are not required to include any such information in privilege logs.

20337400

B. The Parties agree that certain privileged communications or documents should not be included in a privilege log: (a) privileged communications and work-product exclusively between a Party and its outside litigation counsel after November 24, 2025; (b) work product of counsel created after November 24, 2025; and (c) any privileged communication or work-product created after November 24, 2025.

C. The privilege log shall identify for each claimed privileged document: (1) a unique document identifier; (2) a description sufficient to allow the Parties to analyze the relevance and claimed privilege; (3) the date of the document; (4) the author of the document; (5) all recipients of the document; and (6) the claimed basis for withholding the document.

D. The Parties agree that a privilege log will be provided within sixty (30) days of the substantial completion of the production of documents; provided, however, that all privilege logs will be provided with sufficient time to permit the Receiving Party to review the privilege logs, meet and confer with the Producing Party, and bring any motion regarding those privilege logs prior to the close of discovery.

E. The production of privileged or work-product protected documents, electronically stored information ("ESI") or information, whether inadvertent or otherwise, is not a waiver of the privilege or protection from discovery in this case or in any other federal or state proceeding. This Order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d).

## VIII.  Reservation of Rights

A. Nothing contained herein is intended to or shall serve to limit a Party's right to conduct a review of documents, ESI, or other information (including metadata) for relevance, responsiveness and/or segregation of privileged and/or protected information before production.

Dated: March 24, 2026
    New York, New York

_____
**VALERIE CAPRONI**
**UNITED STATES DISTRICT JUDGE**

11

20337400

**SILLS CUMMIS & GROSS P.C.**

By:  */s/ Sarah Franzetti*
    Matthew P. Canini
    Sarah Franzetti
    101 Park Avenue, 28th Floor
    New York, New York 10178
    (212) 643-6000
    (212) 643-6500 (fax)
    mcanini@sillscummis.com
    sfranzetti@sillscummis.com

*Attorneys for Plaintiff Amsler Advisors*

| **HASBANI & LIGHT, P.C.** | **GORDON REES SCULLY MANSUKHANI LLP** |
|---|---|
| By: */s/ Shauna M Deluca* | By: */s/ Anthony De Ingeniis* |
|   Shauna M Deluca |   Anthony De Ingeniis |
|   Rafi Hasbani |   1 Battery Park Plaza, 28th Floor |
|   450 7th Avenue |   New York, NY 10004 |
|   Suite 1901 |   (917) 508-9201 |
|   New York, NY 10123 |   adeingeniis@grsm.com |
|   (212) 643-6677 | |
|   (347) 491-4048 (fax) | *Attorneys for Defendant GVA* |
|   sdeluca@hasbanilight.com | *Property Management* |
|   hllawpc@gmail.com | |
| | |
| *Attorneys for Defendant Albert Reuben Capital, LLC* | |

20337400

13

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I hereby certify that on March 20, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent by operation of the Court's electronic filing system to all Parties indicated on the electronic filing receipt.

*/s/* Sarah Franzetti

_____

20337400

**EXHIBIT A**

|   | Field Name[1] | Field Description | Applicable Doc Type |
|---|---|---|---|
| 1 | PROD_BEG | Beginning Bates number[2] (production number) | All |
| 2 | PROD_END | Ending Bates number[2] (production number) | All |
| 3 | BEG_ATT | First Bates number of family range[2] (i.e. Bates number of the first page of the parent email) | All |
| 4 | END_ATT | Last Bates number of family range[2] (i.e. Bates number of the last page of the last attachment) | All |
| 5 | CUSTODIAN | Name of the party producing the document | All |
| 6 | VOL | Production Volume Number | All |
| 7 | ALL_CUSTODIANS | Name(s) of person or data source from where documents/files are produced. Where redundant names occur, individuals should be distinguished by an initial which is kept constant throughout productions (e.g., Smith, John A. and Smith, John B.). Each name delimited by a ";" | All |
| 8 | CHILD_PATH | The folder path with filename as it is embedded to it's parent. This includes the filename with extension | EDocs & Emails |

---

[1] Field Names may vary from system to system and even between different versions of systems. Thus, Parties are to be guided by these Field Names and Descriptions when identifying the metadata fields to be produced for a given document pursuant to this ESI Protocol Order.

[2] See note about Bates Stamp at V. B. 3. Under Search and Review.

20337400

| | Field Name[1] | Field Description | Applicable Doc Type |
|---|---|---|---|
| 9 | CHECKSUM | Agreed upon Checksum Hash, either MD5, SHA1 or SHA256 | All |
| 10 | PG_COUNT | Number of pages in the document | All |
| 11 | CHILD_COUNT | Number of Child Documents (i.e. email attachments or embedded objects) | E-docs |
| 12 | DOC_EXTS | File extension(s) of the document discovered. Delimited by ";" | E-docs & Emails |
| 13 | REDACTED | Descriptor for documents that have been redacted. "Yes" for redacted documents; "No" for unredacted documents. | All |
| 14 | CONFIDENTIALITY | Indicates if the document has been designated as "Confidential" or "Highly Confidential" pursuant to any applicable Protective Order. "No" indicates those documents that are not so designated. | All |
| 15 | EMAIL_THREAD_INDEX | Message header identifier that permits threading of email chains in review software | Email |
| 16 | EMAIL_MSGID | Unique Email Message Identifier assigned at time of sending. Used to delineate threading[3] | Email |

---

[3] Message ID, References and In-Reply-Tos must be retained in native RFC format as was transmitted. Example: <123ahsd@2134332432.somewhere.there> See RFC 5322 @ 3.6.4.

20337400

| | Field Name[1] | Field Description | Applicable Doc Type |
|---|---|---|---|
| 17 | EMAIL_REFERENCES | References Header data from email header indicating group of email Message IDs[3] | Email |
| 18 | EMAIL_FROM | Sender or Represented as the sender, can contain one or more addresses[4] | Email |
| 19 | EMAIL_SENDER | Actual Sender[4] (single address only, if different from FROM) | Email |
| 20 | EMAIL_TO | Recipients[4] | Email |
| 21 | EMAIL_CC | Additional recipients[4] | Email |
| 22 | EMAIL_BCC | Blind additional recipients[4] | Email |
| 23 | EMAIL_SUBJECT | Subject line of email | Email |
| 24 | EMAIL_SENT | Time Email was Sent[5] | Email |
| 25 | EMAIL_RCVD | Time Email was Received[5] | Email |
| 26 | FILE_TITLE | Title provided by user within the document | Edocs |
| 27 | FILE_AUTHOR | Author of a document | Edocs |
| 28 | FILE_DATE_CREATED | Creation date of file from Metadata[6] | Edocs |
| 29 | FILE_DATE_MOD | Last modified date of file from Metadata[6] | Edocs |

---

[4] Reflects the native transmittal state of the field. Formatted as either example: someone@somewhere.there<Doe, John> or someone@somewhere.there  (See RFC 5322 @ 3.4)

[5] Email Dates Formatted in either native RFC format (Mon, 9 Jul 2019 11:09:23 +0000) or specified ISO 8601 format of (2019-07-09 11:09:23 +0000). See RFC 5322 @ 3.3 or ISO 8601 as YYYY-MM-DD hh:mm:ss Z (Year-Month-Day 24Hr:Min:Sec TimeZone)

[6] File dates represented in ISO 8601 format of (2019-07-09 11:09:23 +0000). See ISO 8601 as YYYY-MM-DD hh:mm:ss Z (Year-Month-Day 24Hr:Min:Sec TimeZone)

20337400

| | Field Name[1] | Field Description | Applicable Doc Type |
|---|---|---|---|
| 30 | FILE_OS_CREATE_DATE | Creation date from Operating System[6] | |
| 31 | FILE_OS_MOD_DATE | Last Modification date from Operating System[6] | |
| 32 | TEXT_PATH | Full path for OCR or Extracted Text files on producing media | All |
| 33 | NATIVE_FILE_LINK | Full path for documents provided in native format on producing media | Email and E-docs |
| 34 | Parentid (ParentBates) | The unique beginning document number of the parent document | All |

17

20337400

**EXHIBIT B**

Opticon File Format (OPT) consists of seven fields that are comma delimited. These fields are:

    a.   Bates Stamp of Page

    b.   Volume Production is on (can be blank)

    c.   Path to the Page Image

    d.   If it is the first page of the document: place a Y, otherwise, leave empty.

    e.   Leave Blank

    f.   Leave Blank

    g.   Number of pages within the document, only used on the first page

If we had two documents: ABC0001 and ABC0003 that totaled three pages, the contents of the Opticon File would be:

ABC0001,VOL01,\IMAGES\01\ABC0001.tif,Y,,,2

ABC0002,VOL01,\IMAGES\01\ABC0002.tif,,,,

ABC0003,VOL01,\IMAGES\01\ABC0003.tif,Y,,,1

18

20337400

**EXHIBIT C**

Load File (DAT) Standards are similar to a spreadsheet. There is one table with columns and rows.

Each column is separated by a delimiter, while the contents of each cell are wrapped by a "quotation" character. Any line returns within a cell are replaced with a non-standard line return character. If there are multiple values within a cell, they a delimited by a semi-colon (ASCII 59). The first row is the title of each Metadata field specified by Exhibit A. The text encoding can be UTF-16, UTF-8, or Windows (Western European or ISO Latin 1)

Summary of ASCII Delimiters and Purpose

| ASCII Character # | Purpose |
| --- | --- |
| 20 | Column Delimiter |
| 254 | Column "Quote" |
| 174 | New-Line Replacement |
| 59 | Multiple Value Delimitation within a cell |

20337400